# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No.  05-4220

_____

Judith Phuobong Ntangsi,                    *
                                            *
            Petitioner,                      *
                                            *   Petition for Review of an Order of the
       v.                                    *   Board of Immigration Appeals.
                                            *
Alberto Gonzales, Attorney General          *
of the United States of America,            *
                                            *
            Respondent.                      *

_____

Submitted: October 18, 2006
Filed: January 30, 2007

_____

Before MELLOY, BENTON, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Judith Phuobong Ntangsi, a native and citizen of the Republic of Cameroon, applied for and was granted asylum by an Immigration Judge ("IJ") in 2001 because he found that Ntangsi possessed a well-founded fear of persecution by Cameroonian officials on account of her political beliefs. The government subsequently investigated the factual allegations underlying her asylum claim and found some grounds to doubt the veracity of her testimony regarding her father and his political activities. Upon the government's motion, the IJ reopened her case and offered Ntangsi time to submit additional evidence, but he denied her requests to allow

telephonic testimony of her own witnesses and to telephonically cross-examine the government's overseas investigator. The IJ found that the new evidence, combined with a lack of adequate corroborating evidence of other allegations of her claim, raised serious concerns about Ntangsi's credibility. He therefore denied her claims for asylum, withholding of removal, and relief under the Convention Against Torture, and the Board of Immigration Appeals ("the Board") affirmed the decision. Ntangsi petitions this court for review of the denial of her application for asylum. We grant the petition.

## I. BACKGROUND

### A. Initial Asylum Hearings

Ntangsi arrived at the Miami International Airport in August of 1999 without proper documentation for entry into the United States. Customs officials detained and interviewed her, and they found that she had a credible fear of persecution upon return to her homeland. She applied for asylum, withholding of removal, and relief under the Convention Against Torture. In November of 2000, following a transfer of venue to Bloomington, Minnesota (where Ntangsi had nearby relatives with whom she could stay), the IJ held a hearing on the merits. Ntangsi was the only witness at the hearing, and the substance of her testimony and accompanying evidence appears below.

Ntangsi was born in Cameroon in 1974. She grew up and attended secondary school in the English-speaking Southwest Province, a part of the former British Cameroon prior to its 1961 merger with French Cameroon. She testified that her father, Fidelis Ntangsi ("Fidelis"), was a founding member of the Social Democratic Front ("SDF"). The SDF is a political party formed in 1990 to protect the rights of Cameroonian Anglophones (a minority in Cameroon) and oppose the political dominance of the country's ruling party, led since 1982 by Francophone President Paul Biya. Fidelis was arrested several times on account of his political activities.

Ntangsi testified that Fidelis lost his job at the Cameroon Development Corporation because of his SDF activities following an arrest in 1996, but that the government had now ceased its harassment of her father and he was currently working as a farmer. Ntangsi also testified that she has two sisters in the United States. Her older sister, Marie, was granted asylum on the basis of political persecution and lives in the Twin Cities. Her younger sister, Chantal, was seeking asylum on the same basis at the time of the hearing.

Ntangsi claimed that she also became an active member of the SDF. She enrolled in the University of Buea in 1995 and attended several SDF rallies. In 1997, she formally joined the party by paying a small fee. She also became the publicity secretary for an SDF student organization, with responsibility for announcing events, distributing literature, and speaking at general meetings of the group's 200 members and occasionally at rallies of 500 people or more. Days before the 1997 presidential election in Cameroon, Ntangsi attended a pre-election rally organized by the student group. Police raided the event, subjecting the students to tear gas and beatings. Ntangsi and some fifty to eighty of the other attendees were imprisoned for four days, including the day of the election.[1] Prison conditions were poor, and the students were beaten and forced to perform hard labor. One guard attempted to rape Ntangsi before the guard's commanding officer intervened. Ntangsi suffered substantial swelling on her body, and after her release from prison she received medical care from a family friend who worked as a nurse.

Despite this incident, Ntangsi testified that she continued her involvement in SDF-related activities. In April of 1999, she co-authored an editorial with the other four officers of the SDF student group. They published it in the local edition of the

---

[1]Biya won the election with more than ninety percent of the vote. The 1999 State Department Report on Human Rights Practices noted that the election was "marred by a wide range of procedural flaws, and generally considered by observers not to be free and fair."

*Cameroon Post*—one of the country's leading newspapers—and *Political Punch*, a national magazine. In June of that year, Ntangsi left campus for a short time to stay in the city of Limbe. When she returned, neighbors told her that police had arrested three of the officers of the SDF student group and taken them to prison in Yaoundé, the national capital. Ntangsi also heard a rumor that one of the officers had died. She had no knowledge of whether any of them were ever released. Ntangsi left for Limbe again, and she returned in July to learn that police had left a convocation, or form of summons to appear, with her neighbors. The document ordered Ntangsi to report to the prison in Yaoundé.

Ntangsi immediately fled to Limbe. She stayed there for two days before a family friend, Patrick Yufenyi, transported her to an island off the coast of Cameroon. Yufenyi apparently applied for a passport for Ntangsi without her knowledge, and he returned to the island one month later with the official passport in hand. They left the island for Douala, where Yufenyi had arranged for Ntangsi's air travel out of Cameroon. Ntangsi's flight took her to Paris, then to Miami, where her involvement with U.S. immigration officials began.

After listening to Ntangsi's testimony at this initial merits hearing, the IJ continued the case to allow the parties time to submit evidence either corroborating or discrediting three aspects of Ntangsi's claim: (1) her and her family's role and activities in the SDF; (2) the editorial she co-authored with other SDF student officers shortly before she was ordered to report to prison; and (3) the arrest of other SDF student officers and the rumored death of one of those officers.

After another continuance at the government's request, the IJ held a hearing in August of 2001. At that hearing, the government argued that it needed an indefinite amount of time to await the results of a State Department investigation into Ntangsi's factual allegations and a forensic lab report on the legitimacy of certain documents. The IJ opted to rule on Ntangsi's application for asylum. He noted that her exhibits—

including statements to immigration inspectors, the application for asylum, documents related to her credible-fear screening, copies of her SDF membership cards and the convocation for her arrest, photographs of her injuries subsequent to her arrest, other identification documents, Cameroon country reports, and Marie's application for asylum—were generally consistent with Ntangsi's testimony. The IJ expressed some concerns regarding Ntangsi's credibility, particularly the legitimacy of the photographs and the lack of strong corroborating evidence of her role in the SDF. Nevertheless, he found that she was generally credible and gave weight to her testimony. As to her claim, he found that her prior arrest constituted past persecution on a protected ground, entitling her to a presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). The IJ also stated that Ntangsi would have met her burden of showing a well-founded fear of future persecution even without the benefit of that presumption. Therefore, he granted Ntangsi's application for asylum.

After announcing the order, the IJ informed Ntangsi that the government was "still investigating the case. If it turns out that any of the claims that you have advanced are fabricated, your case is going to be back here in court, and you're going to have to explain what's going on."

B.  Reopening of Ntangsi's Case

Eighteen months later, the IJ followed through on this warning. He granted the government's motion to reopen the case on February 19, 2003, after the government submitted evidence that Fidelis Ntangsi had not been fired by the Cameroon Development Corporation for political reasons. A State Department investigation found that the Corporation had instead only demoted him, although the State Department also found that the reason for the demotion was indeed Fidelis's political beliefs and that Fidelis did in fact work on a farm.

The IJ held a hearing in May, and he granted Ntangsi's motion for a continuance to review the government's new evidence and submit her own in response. Ntangsi also asked for an opportunity to cross-examine the State Department investigator, arguing that cross-examination was particularly crucial in her case because the Third Circuit had recently ruled that an investigative report submitted by the U.S. Embassy in Cameroon in a different asylum case was so unreliable that the Board violated the alien's due process rights by relying upon it. Ezeagwuna v. Ashcroft, 325 F.3d 396, 406-08 (3d Cir. 2003). The IJ noted this case, but stated that Third Circuit authority did not bind his decisions, he had no subpoena power over a foreign investigator, and Ntangsi would have to discuss that matter with the State Department. Ntangsi also asked the IJ to allow the telephonic rebuttal testimony of Fidelis, at Ntangsi's expense, to be taken from the U.S. Embassy in Cameroon. The IJ agreed, stating that such a procedure was "fine, if you can provide sufficient assurances that we know that the person on the other end of the phone is who it's supposed to be" and that "[g]oing to a consular or an embassy would be the normal way to do that."

Following this hearing, Ntangsi formally moved to allow the telephonic testimony of Fidelis Ntangsi and Ngomanji Emmanuel, an administrative officer of the SDF. The IJ did not rule on the motion before Ntangsi's next hearing in October of 2003. At that hearing, Ntangsi renewed her request to allow her father and Emmanuel to testify by telephone. The IJ refused: "I'm not eager to try to do telephonic testimony for witnesses who are not in court, who I've had no real prior dealings with, and particularly when coming from a foreign country, it's very hard." In addition, he noted that Ntangsi had already submitted affidavits from these individuals. By refusing to allow telephonic testimony of any witnesses, he stated that the government could not cross-examine Ntangsi's affiants and Ntangsi could not cross-examine the government's investigator, "so you're basically on the same footing." Ntangsi objected to the exclusion of live testimony from these witnesses. She also asked the IJ to draw a negative inference with regard to the credibility of the

government investigator's report because the government had declined requests to make the investigator available for cross-examination. The IJ noted the objection and request for a negative inference, but he did not rule upon them. After this discussion, neither side called any witnesses, and both rested upon the record in the case.

## C. Decisions of the IJ and the Board

The IJ issued a new decision in the case on July 23, 2004. In the written decision, he said he "gave the respondent the benefit of the doubt previously," but that the basis for that benefit—the fact that the government presented no evidence to dispute her allegations—disappeared when the subsequent government investigation produced evidence that contradicted some of her testimony. Therefore, he found that her claim was not credible. Upon consideration of the results of the investigation and "the lack of really solid, contemporaneous corroboration of the core elements" of Ntangsi's alleged persecution, the IJ denied her applications for asylum, withholding of removal, and relief under the Convention Against Torture.

Ntangsi appealed to the Board, arguing that (1) the IJ erred in his adverse credibility finding and denial of asylum relief to Ntangsi, particularly after he had previously found Ntangsi credible and eligible for relief; (2) the IJ abused his discretion and violated Ntangsi's due-process rights by failing to allow the telephonic testimony of Fidelis Ntangsi and Ngomanji Emmanuel; and (3) the IJ abused his discretion and violated Ntangsi's due-process rights by relying upon the investigator's report and failing to draw a negative inference as to its reliability, based on the fact that the government refused to make him available for cross-examination. The Board rejected these claims, ruling that the IJ was justified in relying upon the investigator's report and in making an adverse credibility finding, given the inconsistency between Ntangsi's testimony and the later-discovered evidence relating to her father. It also ruled that the IJ's refusal to admit the telephonic testimony was not reversible error

because there was no indication that it "would have materially benefitted this case or changed its outcome."

Ntangsi now appeals to this court, raising the same arguments she made before the Board. She did not appeal the decision to reopen her case to the Board or to this court in her opening brief; she appeals only the subsequent procedural rulings and ultimate denial of her asylum claim.

## II. DISCUSSION

We review the Board's factual findings for substantial evidence and its legal determinations *de novo*. Phommasoukha v. Gonzales, 408 F.3d 1011, 1014 (8th Cir. 2005). "We review constitutional challenges to immigration proceedings *de novo*." Shoaira v. Ashcroft, 377 F.3d 837, 842 (8th Cir. 2004).

When the government succeeds in reopening the proceedings of alien who was previously granted asylum, it carries the burden of proving—by a preponderance of the evidence— one of several grounds for terminating asylum. 8 C.F.R. § 208.24(f). Under that regulation and its related statute, 8 U.S.C. § 1158(c)(2), the only plausible ground for terminating Ntangsi's asylum in this case would have been "a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted." 8 C.F.R. § 208.24(a)(1), (f). The failure to place this burden upon the government is reversible legal error. See Hailemichael v. Gonzales, 454 F.3d 878, 885 (8th Cir. 2006).

After examining the record of the reopened proceedings in this case, it is clear that neither the IJ nor the Board placed the burden of proving fraud upon the government. Instead, the language of the written decisions by both the IJ and the Board shows that they placed the burden on Ntangsi to prove her asylum eligibility anew upon the reopening of her case. The terms of 8 C.F.R. § 208.24(f) make it clear

that the government is not relieved of its burden of proving fraud by a preponderance of the evidence merely because it makes a showing sufficient to reopen a proceeding. Compare 8 C.F.R. § 1003.23(b)(3) ("A motion to reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing.") with 8 C.F.R. § 208.24(f) ("In such a reopened proceeding, the Service must establish, by a preponderance of evidence, one or more of the grounds [for terminating asylum]."); see also Hailemichael, 454 F.3d at 883 (holding that the language of 8 C.F.R. § 1003.23(b)(3) (formerly 8 C.F.R. § 3.23(b)(3)) applies to motions to reopen for the purpose of terminating asylum).

Under the facts of this case, we cannot say that the failure to apply the proper burden of proof in Ntangsi's reopened proceeding was harmless. In Hailemichael, we noted that the government cannot meet its burden of proving fraud unless it can show that the petitioner knows the statement or document is fraudulent at the time she presents such evidence to the IJ. Hailemichael, 454 F.3d at 885. Neither the IJ nor the Board addressed the issue of whether Ntangsi knew that her testimony was false with regard to her father's employment status.[2] Indeed, Ntangsi actually came forward with evidence that her testimony was accurate and truthful at the time; that is, that her father was fired and later reinstated in a lesser position with the Corporation after union negotiations. Because the IJ and the Board never considered whether the preponderance of all the evidence regarding Fidelis's employment favored a finding of fraud, we must remand to the Board to apply the proper standard for terminating asylum under 8 C.F.R. § 208.24. To terminate Ntangsi's prior grant of asylum in these remanded proceedings, the government must prove, by a

---

[2]The IJ did note that Ntangsi's sister listed her father's work address at the Cameroon Development Corporation in a 1999 application for an immigrant visa. There was no showing, however, that her sister had full knowledge of her father's employment status at the time or that she shared this knowledge with Ntangsi prior to Ntangsi's 2000 hearing.

preponderance of the evidence, that: (1) Ntangsi committed fraud in her asylum application, 8 C.F.R. § 208.24(a)(1); (2) she knew of the fraud, <u>Hailemichael</u>, 454 F.3d at 885; and (3) the fraud was "such that . . . she was not eligible for asylum at the time it was granted." 8 C.F.R. § 208.24(a)(1).

Because we find the above grounds sufficient to grant the petition, we need not reach the constitutional issues raised by the IJ's reliance upon the government investigator's report without opportunity for telephonic cross-examination, as well as the IJ's refusal to permit the telephonic testimony of Ntangsi's witnesses.

## III. CONCLUSION

For the foregoing reasons, we grant the petition for review.

_____